UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Kevin Gibson, | ) | CASE NO. 1:20 CV 422 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | |
| | ) | Memorandum of Opinion and Order |
| JP Morgan Chase Bank, N.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Before the Court are the Motions to Dismiss of JP Morgan Chase Bank N.A. ("JP Morgan Chase") and Jamie Dimon ("Dimon")(Doc. No. 18), U.S. Bank Trust, N.A. as Trustee for LSF9 Master Participation Trust ("U.S. Bank") and Caliber Home Loans, Inc. ("Caliber")(Doc. No. 10), Bayview Loan Servicing, LLC ("Bayview"), and Lerner, Sampson & Rothfuss ("LSR")(Doc. No. 17), and Clifford Pinkney ("Pinkney")(Doc. 21).  Plaintiff Kevin Gibson ("Gibson") opposes the Motions (Doc. No. 22).   For the reasons stated below, the Motions are granted, and this case is dismissed.

## GIBSON'S ALLEGATIONS

In 1993, Gibson's mother, Sylvia Gibson, purchased the property in question located at 15411 McCauley Avenue in Cleveland, Ohio.  (Doc. 1 at PageID #20, ⁋ 54).  She signed a thirty-year mortgage on the property for $35,000, at an interest rate of 7.625% from Bank One. (Doc. 1 at PageID #21, ⁋ 54).  Although she had health concerns, she faithfully made

her monthly payments of $ 247.73.  (Doc. 1 at PageID #6, ℙ 20).  Bank One sold the mortgage to Homeside Lending which became Washington Mutual.  (Doc. 1 at PageID #8, ℙ 23).  Washington Mutual transferred the mortgage to MERS which transferred it to JP Morgan Chase in September 2010. (Doc. 1 at PageID #8, ℙ 23).

Sylvia Gibson struggled to make the mortgage payments in 2011 and approached JP Morgan Chase about refinancing under its mortgage relief program. (Doc. 1 at PageID #22, ℙ 57).  Interest rates had dropped to 3% by that point, and refinancing would have lowered her monthly payment to under $100.00.  (Doc. 1 at PageID #22, ℙ 57).  Gibson alleges a JP Morgan Chase representative told his mother that she would need to miss a few mortgage payments to qualify for the program. (Doc. 1 at PageID #22, ℙ 57).  Gibson indicates he was skeptical of this advice and using the Power of Attorney given to him by his mother, contacted JP Morgan Chase in writing to request information on the mortgage status under the Real Estate Settlement Procedures Act ("RESPA").  (Doc. 1 at PageID #22, ℙ 57).  He indicates he repeated his request several times but did not receive an adequate response. (Doc. 1 at PageID #22, ℙ 57).  Gibson alleges his mother did not receive refinancing from JP Morgan Chase and continued to make payments.  (Doc. 1 at PageID #22-23, ℙ 59, 60, 61).  Gibson attempted to rescind the mortgage on behalf of his mother and demanded return of money she paid on the mortgage, but JP Morgan Chase did not respond to that request.  (Doc. 1 at PageID #23, ℙ 59).

In July 2013, Sylvia Gibson filed for bankruptcy under Chapter 7.  (Doc. 1 at PageID #6, ℙ 20).  Gibson indicates the bankruptcy was supposed to be converted to Chapter 13. (Doc. 1 at PageID #6-7, ℙ 20).  He does not indicate the disposition of that case.  He alleges

his mother filed the bankruptcy to force a modification of the loan. (Doc. 1 at PageID #23, ⁋ 60).  He states that attorneys for JP Morgan Chase did not respond.  (Doc. 1 at PageID #23, ⁋ 60).

JP Morgan Chase transferred the mortgage to Bayview in December 2013. (Doc. 1 at PageID #22, ⁋ 57).  Gibson contends his mother missed her first mortgage payment in December 2013.  (Doc. 1 at PageID #7,23, ⁋ 20, 61).  Bayview filed a foreclosure action against Sylvia Gibson on March 28, 2014.  (Doc. 1 at PageID #7, ⁋ 20).  Gibson was also named as a Defendant in that action because at some point Sylvia Gibson added his name to the title.  *See Bayview Loan Servicing, LLC vs. Sylvia R. Gibson, et al*., No. CV-14824451 (Cuyahoga Cty Ct. Comm. Pl. filed Mar. 28, 2014) (Doc. 17-2 at PageID# 249 at ⁋ 8).  Gibson does not allege that he assumed liability for the mortgage.  In fact, he attaches a copy of the note and the mortgage demonstrating that they were solely in Sylvia Gibson's name.  (Doc. 1-3, 1-4).  LSR served as counsel to Bayview in the foreclosure. (Doc. 1 at PageID #23, ⁋ 61).

Gibson and his mother, through counsel, filed an answer to the foreclosure complaint generally denying the allegations and raising nine affirmative defenses, including challenges to Bayview's standing to bring the foreclosure.  (Doc. 17-3) (answer to foreclosure complaint).  Bayview filed a Motion for Summary Judgment.  Gibson and his mother opposed that Motion challenging, in part, the validity of the transfer of the note and mortgage from JP Morgan Chase to Bayview.  (Doc. 17-4) (Doc. 1 at PageID #31, ⁋ 81).  Gibson indicates he received poor advice from the bankruptcy attorney and did not file a proper response in the foreclosure matter.  (Doc. 1 at PageID #31, ⁋ 81).  He states he was hoping

3

to get a modification and a new payment plan through the bankruptcy court, but the Defendants continued with the foreclosure.  (Doc. 1 at PageID# 31 at ⁋ 81).  On August 8, 2016, the Cuyahoga County Common Pleas Court granted Bayview's Motion for Summary Judgment finding that Bayview had standing to bring the foreclosure and entered a final judgment for Bayview in the amount of $ 17,832.22, with interest at a rate of 7.6250 % per annum from March 1, 2010.  (Doc. 17-5 at PageID# 302).  Gibson does not allege that either he or his mother appealed that judgment.  Bayview contends they did not appeal.  (Doc. 17 at PageID# 213).

Following the foreclosure judgment, the property was scheduled for sheriff's sale. As part of this process, the court instructs the sheriff to appoint appraisers to value the property.  (Doc. 1 at PageID# 13 at ⁋ 36).  Gibson contends that Ohio Revised Code § 2329.17 requires the sheriff to appoint three disinterested county residents who own property to conduct the appraisals.  (Doc. 1 at PageID #13-14, ⁋ 36, 38).  Gibson states that experience in real estate was not a statutory requirement allowing prior sheriffs to appoint family members, friends, and political supporters to these paid positions.  (Doc. 1 at PageID #14, ⁋ 38-39).  He indicates Cuyahoga County Executive Ed Fitzgerald attempted to reform the appraisal process by adding the criteria of at least five years of appraisal experience with preference being given to those individuals with a current certification.  (Doc. 1 at Page ID# 14, ⁋ 40).  He alleges that when Pinkey became sheriff the enforcement of the appointment standards became lax.  He contends Pinkey appointed the same three people in every case: an attorney who resided outside of Cuyahoga County, a business owner who resided in the County, and a sheriff's deputy who was not on the approved list of appraisers, had no

4

appraisal experience and lived in an unknown county.  (Doc. 1 at PageID #16, P 44).  He claims all comparable properties to the property in question were valued at $ 45,000 or higher.  (Doc. 1 at PageID #16, P 44).  He states these appraisers set the value of the house artificially low at just $ 12,000, allowing for the house to sell for a minimum bid of $ 8,000.00.  (Doc. 1 at PageID #16, P 44).  He contends that if the house had been appraised for $ 45,000, a minimum bid of $ 30,000 would have been required.  That minimum bid would have exceeded the amount of the judgment and would have required Bayview to refund the difference between the purchase price and the judgment to his mother.  (Doc. 1 at PageID #16, P 44).  Bayview submitted the winning minimum bid of $ 8,000 and assigned it to U.S. Bank who submitted payment.  (Doc. 17 at PageID# 213) (Doc. 1 at PageID #26, P 68).  The court confirmed the sale on November 20, 2017.  (Doc. 1 at PageID# 18, P 49).  Pinkney executed a sheriff's deed to U.S. Bank on December 12, 2017.  (Doc. 1 at PageID# 17 at P 45).

At some point after the foreclosure action was initiated, Sylvia Gibson died.  (Doc. 1 at PageID #20, P 54).  It is not clear from the Complaint or the Motions if she died prior to the judgment of foreclosure, after the judgment was issued but prior to the confirmation of sale, or after the confirmation of the sale but prior to the filing of this action.

It is not entirely clear from the Complaint what roles Dimon or Caliber had in this mortgage transaction or litigation.  Gibson states that Dimon is the CEO of JP Morgan Chase.  He contends that in 2012, Dimon sent a letter to JP Morgan Chase shareholders acknowledging responsibility for the mortgage crisis, stating that the company originated mortgages that a decade earlier would not have been given, had poor servicing of those

5

mortgages and was ill-prepared to deal with the extraordinary volume of troubled mortgages and upset borrowers.  (Doc. 1 at PageID# 9, ⁋ 27).  Gibson states that JP Morgan Chase's poor handling of mortgages began under Dimon's leadership.  (Doc. 1 at PageID# 33, 48, ⁋ 84, 151).  He, however, does not allege facts suggesting Dimon was personally involved in any of the actions relating to Sylvia Gibson's mortgage.  Gibson's allegations against Caliber are similarly vague.  He states that Caliber is a special servicer that acquires loans for servicing that are delinquent or in default.  (Doc. 1 at PageID# 4-5, ⁋ 13).  He indicates Caliber acted as an agent of U.S. Bank, but he does not explain how they participated in the actions alleged in the Complaint.  (Doc. 1 at PageID# 5, ⁋ 16).

On February 24, 2020, more than two years after the state court confirmed the sheriff's sale, Gibson filed the Complaint in this case. The Complaint contains seven counts for relief.  Only the first, fourth and fifth counts contain definite federal claims.  Counts two and three assert state law tort claims.  Count six asserts claims for bad faith dealings and "duality," but the legal basis for the claim is not clear.  JP Morgan Chase, Dimon, Bayview and LSR liberally construe the claim as asserting violations of the regulations found in 12 C.F.R. § 1024.41.  (Doc. 17 at PageID# 225, Doc. 18 at PageID# 326).  The last count, seven, seeks declaratory relief but does not assert a legal claim.  In addition, Gibson states this Court has subject matter jurisdiction under 42 U.S.C. § 1983 for claims arising under the constitution.  (Doc. 1 at PageID# 3, ⁋ 4).  He does not indicate a particular person against whom this claim is stated; however, he indicates it pertains to Fourth Amendment violations. (Doc. 1 at PageID# 47, Count V Heading).

6

In his first count, Gibson asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  It is not clear against whom he intends to assert this claim.  He initially states he is asserting this claim against Dimon, JP Morgan Chase, LSR, and Pinkney. (Doc. 1 at PageID# 2, ℙ 2).  Later in the Complaint, he indicates he is asserting this claim against all Defendants.  (Doc. 1 at Page ID# 35, ℙ 94).  He contends the mortgage companies, law firms and county officials all worked together to defraud homeowners of their properties. He asserts JP Morgan Chase orchestrated the enterprise by acquiring the loans and servicing them.  (Doc. 1 at Page ID# 24, ℙ 62-63).  He indicates that the interest rates on the loans result in repayment to the mortgage companies of an amount far in excess of the amount actually borrowed.  (Doc. 1 at PageID# 7, ℙ 20, PageID# 28, ℙ 75).  He claims the enterprise prepared for a high level of default and have attorneys like LSR available to file the foreclosures. (Doc. 1 at Page ID# 24, ℙ 62-63).  He states that the enterprise creates documents purporting to transfer the mortgage multiple times to confuse the homeowner. (Doc. 1 at Page ID# 25, ℙ 65).  He contends the enterprise promises to help homeowners avoid default, while continuing to deny them relief and pushing them toward foreclosure. (Doc. 1 at Page ID# 25, ℙ 65).  He indicates that the foreclosure is filed without proper notice. (Doc. 1 at Page ID# 25, ℙ 65).  Gibson asserts that the sheriff contributed to the enterprise by appointing appraisers who arrived at artificially low valuations to allow the mortgage companies to buy the property at sheriff's sale for a fraction of its worth.  (Doc. 1 at PageID# 16, ℙ 44).  He contends that because the sale price is lower than the amount of the judgment, no money is paid back to the borrower, and in fact additional money is owed on the judgment. (Doc. 1 at PageID# 18, ℙ 48).  The law firm, the sheriff and the appraisers receive fees for

their work. (Doc. 1 at PageID# 13-17, ⁋ 38, 47). Gibson contends that at a 7.625% interest rate, his mother paid $68,000 on a $35,000 loan and still had a judgment taken against her for $17,800. (Doc. 1 at Page ID# 16, ⁋ 44). Her home, worth $45,000, was allowed to sell for just $8,000 to the mortgage holder who can then turn around and sell it for its true value. (Doc. 1 at Page ID# 16, ⁋ 44). Gibson asserts that the enterprise used mail and wire transactions to perform its operations. He claims these were the predicate acts for the RICO claims. (Doc. 1 at Page ID# 34-35, ⁋ 87-93).

In his fourth count, Gibson asserts claims under RESPA and the Truth in Lending Act ("TILA"). Initially, he states these claims against JP Morgan Chase, Bayview and LSR. (Doc. 1 at PageID# 2, ⁋ 2). He later states that the claims are asserted against JP Morgan Chase, its assigns, successors and agents. (Doc. 1 at PageID# 44, ⁋ 132). He lists the agents of JP Morgan Chase as LSR and Bayview. (Doc. 1 at PageID# 46, ⁋ 147). These claims are based on the written requests for information under RESPA Gibson submitted on behalf of his mother to JP Morgan Chase and the request for rescission Gibson submitted for her to JP Morgan Chase under TILA.

Gibson's fifth count asserts claims under the Fair Debt Collection Practices Act ("FDCPA") and 42 U.S.C. § 1983. He initially asserts the FDCPA claim against JP Morgan Chase, Bayview, and LSR. (Doc. 1 at PageID# 2, ⁋ 2). He later indicates the claim is asserted against JP Morgan Chase, "Realtor," and Pinkney. (Doc. 1 at PageID # 47, Count V Heading). The body of Count V also mentions Dimon and Bayview. Gibson provides no information concerning his claim under 42 U.S.C. § 1983 except in the heading where he indicates this claim is based on the Fourth Amendment. (Doc. 1 at PageID # 47, Count V

8

Heading).  He claims JP Morgan Chase violated the FDCPA by failing to respond to his mother's RESPA request or the rescission request and failed to notify them of the changes in ownership or the addition of the allonges to the mortgage. (Doc. 1 at Page ID# 48, ℙ 151). He contends Dimon takes pride in being in full control of the operations at JP Morgan Chase. (Doc. 1 at Page ID# 48, ℙ 151).  He indicates Dimon could have insured that Bayview validated the appraisal so that it was fair to Sylvia Gibson.  (Doc. 1 at PageID# 48, ℙ151(d)). He states JP Morgan, Dimon, Bayview and LSR filed a foreclosure without notice or giving Sylvia Gibson a chance to cure the defect and without considering the RESPA and Rescission claims she made to JP Morgan Chase.  (Doc. 1 at Page ID# 49, ℙ 152, 153.  He indicates that LSR made false representations to bankruptcy court to lift the stay and sell the house.  (Doc. 1 at PageID# 49, ℙ 153).  He claims these actions violated 15 U.S.C. § 1692(a)(6), prohibiting the collection of any amount that is not expressly authorized by the agreement creating the debt or permitted by law.

Gibson asserts claims for "bad faith dealings" and "duality" in count six.  He indicates this claim is asserted against Dimon, JP Morgan Chase and LSR.  (Doc. 1 at PageID# 2, ℙ 2).  He states in another part of the Complaint that the claim is asserted against JP Morgan and its agents and assigns.  (Doc. 1 at PageID# 50, ℙ 50).  It is not clear if these are the same Defendants as listed originally in the Complaint.  Gibson alleges that the Consumer Financial Protection Bureau issued mortgage servicing rules that went into effect in 2013.  (Doc. 1 at Page ID# 51 at ℙ 165).  He indicates these rules were intended to ensure that borrowers who are struggling to pay their mortgages get a fair opportunity to avoid foreclosure.  (Doc. 1 at PageID# 51 at ℙ 165). He states that under these rules, a mortgage servicer cannot initiate

foreclosure proceedings after the borrower submits a completed application for loan modification and must forebear from pursuing foreclosure while the application is pending. (Doc. 1 at PageID# 51 at ₱ 165). In addition, Gibson alleges JP Morgan and other major banks settled a lawsuit with the federal government and the terms of that lawsuit require the servicers to cease foreclosure and sheriff sale activities if a loan modification has been requested unless the offer is rejected, or the borrower fails to live up to the terms of the temporary modification. (Doc. 1 at PageID# 52 at ₱ 165). Gibson claims his mother was ready to complete and submit any loan modification documents that would have been received but no forms were sent. (Doc. 1 at PageID# 52 at ₱ 167). He contends he read reports and was always told that JP Morgan Chase would provide assistance with loan problems. He indicates statements made before and after default led him to believe they were working to help his mother obtain a loan modification. He states that instead of providing real help, they were moving forward with foreclosure proceedings. Gibson states that JP Morgan engaged in duality. JP Morgan Chase, Dimon, Bayview and LSR liberally construe the claim as asserting violation of the regulations found in 12 C.F.R. § 1024.41 regarding loss mitigation procedures. (Doc. 17 at PageID# 225, Doc. 18 at PageID# 326).

Gibson's remaining counts, two and three, contain state law claims for common law fraud, intentional infliction of emotional distress, and breach of duty. (Doc. 1 at PageID# 2, ₱ 2). In count seven he asks this Court to enjoin the Defendants from enforcing the judgment of foreclosure, the sheriff's sale and the forcible detainer issued in an eviction action. (Doc. 1 at PageID# 54, ₱ 175). He also seeks compensatory and punitive damages. (Doc. 1 at Page

ID# 34, P 99, PageID# 41, P 117, PageID# 43, P 129, PageID# 46, P 148, PageID# 50, P 160, PageID# 53, P 169, PageID# 54, P 175).

### DEFENDANTS' MOTIONS TO DISMISS

The Defendants filed Motions to Dismiss the Complaint under Federal Civil Procedure Rule 12(b)(6).  (Docs. 10, 17, 18, 21).  Pinkney also seeks relief under Rule 12(b)(2), (4), and (5).  (Doc. No. 21).  They claim Gibson lacks standing to raise claims pertaining to his mother's mortgage.  (Doc. No. 17 PageID# 210, Doc. No. 18 PageID# 311, 324).  They claim the Rooker-Feldman doctrine bars this action.  (Doc. No. 10-1 at PageID# 140, Doc.  18 at PageID# 316, Doc. 21).  They assert the claims were litigated or should have been litigated in the state court foreclosure action and are now barred by *res judicata* from being brought in this action.  (Doc. 10-1 at PageID# 140, Doc. 17 at PageID# 215, Doc. 18 at PageID# 317, Doc. 21 at PageID# 348).  They contend his claims under RESPA, TILA and the FDCPA are untimely and barred by the statute of limitations.  (Doc. No. 17 at PageID# 218, 220, Doc. 18 at PageID# 323-24).  Finally, they assert Gibson failed to state a claim upon which relief may be granted.  (Doc. Nos. 17 at PageID# 218-19, 224-25, Doc. 18 at PageID# 319, 325-26, Doc. 21 at PageID# 350).

In addition, Pinkney contends that he is the former sheriff and therefore not the real party in interest.  (Doc. 21 at PageID# 345).  He also challenges service stating that the Complaint was mailed to the sheriff's office and not to his residence.  (Doc. 21 at PageID# 345).  He also contends that the suit against him in his official capacity is a suit against the political entity for whom he worked which he contends is the sheriff's office.  He states that the sheriff's office is not *sui juris*, meaning it cannot sue or be sued.  (Doc. 21 at PageID#

345-46).  Finally, he claims he is entitled to quasi-judicial immunity for actions taken to execute a court order, including the order of sale.  (Doc. 21 at PageID# 349).

### STANDARD OF REVIEW

When deciding a motion to dismiss under Federal Civil Rule 12(b)(6), the function of the Court is to test the legal sufficiency of the Complaint.  *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993).  The Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and recently in *Ashcroft v. Iqbal*, 556 U.S. 662, 677-678 (2009) clarified the law regarding what the Plaintiff must plead in order to survive a Motion to Dismiss under Rule 12(b)(6).

When determining whether the Plaintiff has stated a claim upon which relief can be granted, the Court must construe the Complaint in the light most favorable to the Plaintiff, accept all factual allegations as true, and determine whether the Complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 555.  The Plaintiff's obligation to provide the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id*. Although a Complaint need not contain detailed factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true."  *Id*.  The Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court in *Iqbal*, 556 U.S. at 677-78, further explains the "plausibility" requirement, stating that "a claim has facial plausibility when the Plaintiff pleads factual

12

content that allows the Court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Furthermore, "the plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a Defendant acted unlawfully." *Id*.  This determination is a "context-specific task that requires the reviewing Court to draw on its judicial experience and common sense." *Id*.

The Sixth Circuit has held that a court may consider allegations contained in the Complaint, as well as exhibits attached to or otherwise incorporated in the Complaint, all without converting a Motion to Dismiss to a Motion for Summary Judgment.  FED. R. CIV. P. 10(c); *Weiner v. Klais & Co*., 108 F.3d 86, 89 (6th Cir. 1997).

**DISCUSSION**

## <u>Standing</u>

As an initial matter, the Court must address whether Gibson has standing to raise the claims he asserts in this action.  Sylvia Gibson, alone, signed the mortgage.  (Doc. 1 at PageID #20, ⁋ 54, Docs. 1-3, 1-4).  Bayview indicates that Sylvia Gibson later added her son as a title holder on the deed, but he did not assume liability for the mortgage.  (Doc. 17 at PageID# 212).  Gibson alleges he acted on behalf of his mother using the power of attorney she gave to him.  (Doc. 1 at PageID# 6, ⁋ 20).  The Defendants' actions giving rise to this Complaint center on Sylvia Gibson's payment of her mortgage, her default on the mortgage and the collection of her mortgage debt.

In every federal case, the party bringing the suit has the burden to establish standing to prosecute the action. "In essence the question of standing is whether the litigant is entitled to have the Court decide the merits of the dispute or of particular issues." *Warth v. Seldin*,

13

422 U.S. 490, 498 (1975).  Standing jurisprudence has two components: Article III standing, which enforces the Constitution's case or controversy requirement, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992); and prudential standing, which encompasses "the general prohibition on asserting claims based on another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a Plaintiff's Complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Gibson asserts six federal claims.  His claims under RESPA, TILA, and 12 C.F.R. § 1024.41 in regard to loss mitigation procedures are clearly those of his mother and are based on her attempts to exercise her rights under those statutes and regulations.  Even though Gibson may have been acting on her behalf using his power of attorney to request information on the loan, and to seek modification or rescission of the loan, he was asserting her rights, not his own.  He lacks standing to raise those claims.  The same can be said of the claims he asserts under the FDCPA.  The debt in question is that of Sylvia Gibson alone.  The practices to which he objects are failing to respond to her RESPA and TILA notices, filing the foreclosure without giving her a chance to cure the defect.  Those assertions are based on Sylvia Gibson's rights and Gibson lacks standing to raise them.  Gibson's RICO claims are based on the collective effect of the actions alleged in his other federal claims and as he lacked standing to assert those claims, he also lacks standing to assert this one.  Finally, Gibson's claims under 42 U.S.C. § 1983 are not well defined.  He, however, does not allege a violation of his constitutional rights, which is required to establish standing.

14

Sylvia Gibson died at some point after the foreclosure action was filed. Even so, this does not convey standing to her son to assert her claims. Her estate would be the real party in interest, not Gibson.

### *Res Judicata*

Defendants further claim Gibson's claims are barred by *res judicata* because he could have and, in some instances, did raise them in the course of the foreclosure action. They also contend underlying issues supporting his claims were necessarily decided by the foreclosure judgment.

A Plaintiff cannot file an action in federal court to relitigate matters that were already decided in state court proceedings. Federal Courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state. 28 U.S.C. § 1738; *Abbott v. Michigan*, 474 F.3d 324, 330 (6th Cir. 2007); *Young v. Twp. of Green Oak*, 471 F.3d 674, 680 (6th Cir. 2006). To determine the preclusive effect a prior state court judgment would have on the present federal action, the Court must apply the law of preclusion of the state in which the prior judgment was rendered. *Migra v. Warren City School District Board of Educ*, 465 U.S. 75, 81 (1984).

In Ohio, the doctrine of *res judicata* encompasses two related concepts: (1) claim preclusion and (2) issue preclusion. *State ex rel. Davis v. Pub. Emp. Ret. Bd*., 120 Ohio St. 3d. 386, 392 (2008). "Claim preclusion prevents subsequent actions, by the same parties or their privies, based on any claim arising out of a transaction that was the subject matter of a previous action." *Grava v. Parkman Twp*., 73 Ohio St. 3d 379, 382 (1995). Claim preclusion also bars subsequent actions whose claims "could have been litigated in the previous suit."

*Id.* By contrast, issue preclusion, or collateral estoppel, prevents the "relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies," even if the causes of action differ. *Id.*

Here, Gibson's claims under the FDCPA, TILA, RICO, and 12 C.F.R. § 1024.41 are barred by issue preclusion. He contends those claims are based on failure to serve his mother with assignment of the mortgage papers, the addition of unauthorized allonges, the low appraisal price for the sheriff's sale, failure to mitigate losses, false representations made to the bankruptcy court to allow the sale to go forward, and failure to allow rescission. These are all issues that could and should have been asserted in the foreclosure action. Even if he had standing to assert these claims, they would be barred by the doctrine of *res judicata*.

Gibson's claim under RESPA is not obviously barred by Ohio's preclusion doctrine. The Court cannot determine whether this claim was actually asserted in the foreclosure action. If it was litigated in that case, Gibson is barred from asserting it a second time. If, however, it was not raised in that action, it is not barred. The section of RESPA which Gibson claims JP Morgan Chase violated provides that, following receipt of an inquiry, the servicer shall conduct an investigation and then provide the borrower with the information requested, or an explanation of why the requested information is unavailable or cannot be provided by the servicer. 12 U.S.C. § 2605(e)(2)(C)(i). If a loan servicer violates § 2605(e), § 2605(f) provides for damages to the borrower. That is not a claim that would necessarily be required to be raised in the foreclosure action, in part, because JP Morgan was not a party to that action. It is therefore not barred by *res judicata*.

It is difficult to determine whether Gibson's claim under 42 U.S.C. § 1983 is barred by *res judicata* because he does not explain the factual basis for this claim.  To the extent that it is based on the actions giving rise to his claims under FDCPA, TILA, RICO, or 12 C.F.R. § 1024.41, it would also be subject to *res judicata*.  To the extent it is based on foreclosure proceedings, it would also be barred.

**Statute of Limitations**

Furthermore, Gibson's FDCPA, TILA, RESPA and § 1983 claims are time-barred. The statute of limitation period for claims under the FDCPA is one year from the date of the violation.  15 U.S.C.A. § 1692k (d).  The sale was confirmed by the Common Pleas Court on November 20, 2017.  This action was filed in February 2020, more than one year from the last event Gibson includes as a basis for this claim.

The right to rescission under TILA expires no later than three years after the mortgage is signed.  15 U.S.C. § 1635(f).  Sylvia Gibson purchased the home in 1993.  She sought rescission in 2011, fifteen years after the right to rescission expired.

An action for damages under RESPA, 15 U.S.C. § 2605, must be filed within three years of the date of the violation.  12 U.S.C.A. § 2614.  Gibson submitted his written request on behalf of his mother in 2011.  More than three years have passed from that date until this action was filed in 2020.

Ohio's two-year statute of limitations for bodily injury applies to §1983 claims.  *LRL Properties v. Portage Metro Housing Authority*, 55 F. 3d 1097 (6th Cir. 1995).  The actions alleged in the Complaint took place between 1993 and 2017.  This action was filed in 2020, well beyond the expiration of the two-year statute of limitations period.

**Rooker-Feldman Doctrine**

Furthermore, this Court cannot reverse the judgments of the state court nor can it enjoin their enforcement. United States District Courts do not have jurisdiction to overturn state court decisions even if the request to reverse the state court judgment is based on an allegation that the state court's action was a violation of federal law. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp*., 544 U.S. 280, 292 (2005). Federal appellate review of state court judgments can only occur in the United States Supreme Court, by appeal or by writ of certiorari. *Id*. Under this principle, generally referred to as the Rooker-Feldman Doctrine, a party losing his case in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States District Court based on the party's claim that the state judgment itself violates his or her federal rights. *Berry v. Schmitt*, 688 F.3d 290, 298-99 (6th Cir. 2012).

The Rooker-Feldman doctrine is based on two United States Supreme Court decisions interpreting 28 U.S.C. § 1257(a). *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co*., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). This statute was enacted to prevent "end-runs around state court judgments" by requiring litigants seeking review of that judgment to file a writ of certiorari with the United States Supreme Court. The Rooker-Feldman doctrine is based on the negative inference that, if appellate court review of state judgments is vested in the United States Supreme Court, then such review may not occur in the lower federal courts. *Exxon Mobil Corp*., 544 U.S. at 283-84; *Kovacic v. Cuyahoga*

*County Dep't of Children and Family Services*, 606 F.3d 301, 308-311 (6th Cir. 2010); *Lawrence v. Welch*, 531 F.3d 364, 369 (6th Cir. 2008).

Rooker-Feldman is a doctrine with narrow application.  It does not bar federal jurisdiction "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Exxon Mobil Corp.*, 544 U.S. at 293; *Berry*, 688 F.3d 298-99.  It also does not address potential conflicts between federal and state court orders, which fall within the parameters of the doctrines of comity, abstention, and preclusion. *Berry*, 688 F.3d 299.  Instead, the Rooker-Feldman doctrine applies only where a party losing his or her case in state court initiates an action in federal district court complaining of injury caused by a state court judgment itself and seeks review and rejection of that judgment. *Berry*, 688 F.3d 298-99; *In re Cook*, 551 F.3d 542, 548 (6th Cir. 2009).  To determine whether Rooker-Feldman bars a claim, the Court must look to the "source of the injury the Plaintiff alleges in the federal complaint." *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006); *see Berry*, 688 F.3d at 299; *Kovacic*, 606 F.3d at 310.  If the source of the Plaintiff's injury is the state-court judgment itself, then the Rooker-Feldman doctrine bars the federal claim. *McCormick*, 451 F.3d at 393. "If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Id.*; *see Lawrence*, 531 F.3d at 368-69.  In conducting this inquiry, the court should also consider the Plaintiff's requested relief. *Evans v. Cordray*, No. 09-3998, 2011 WL 2149547, at *1 (6th Cir. May 27, 2011).

In this case, the source of the injury for many of Gibson's claims is the state court judgment itself.  He asks this Court to enjoin the Defendants from enforcing the judgment of

foreclose, the sheriff's sale and the forcible detainer issued in an eviction action.  (Doc. 1 at PageID# 54, ⁋ 175).  This Court lacks jurisdiction to grant that relief.

## Caliber and Dimon

Moreover, even if Gibson could overcome the fatal defects of standing, *res judicata*, statute of limitations and the Rooker-Feldman Doctrine, he fails to state a claim upon which relief may be granted.  As an initial matter, he does allege facts suggesting Dimon or Caliber were directly involved in the actions giving rise to this Complaint.  He contends under Dimon's leadership as the CEO of JP Morgan Chase, the corporation as a whole accepted responsibility for its role in the mortgage crisis and settled a lawsuit with the federal government.  He also contends Dimon accepted a generous salary from JP Morgan Chase.  Those allegations, however, do not suggest that he was personally involved in the actions giving rise to Gibson's RESPA, TILA, FDCPA, or RICO claims.  Similarly, Gibson includes no factual allegations against Caliber.  He does not suggest what role, if any, they had in the events described in the Complaint.

## RICO Claims

Gibson first asserts RICO claims against Dimon, JP Morgan Chase, LSR, and Pinkney.  Pursuant to 18 U.S.C. § 1964(c), RICO provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." In turn, Section 1962 states in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of
> the provisions of subsection ... (c) of this section.

A "pattern of racketeering activity" requires at least two acts of "racketeering activity" which are set forth in Section 1961(1).  18 U.S.C. § 1961(5).

Gibson asserts mail fraud and wire fraud as the racketeering activity.  He, however, does not plead any facts to suggest how the Defendants specifically violated these statutes. He merely concludes that mail or wire transfers had to be involved in the mortgage loan process.  That alone, however, does not make the mailing or the wire transfer an illegal or fraudulent activity.  These claims are stated solely as legal conclusions which are not sufficient to state a claim.  Gibson's only allegations supporting his RICO claims are those alleging that his mother took out a mortgage, was unable to make the payments, could not obtain mortgage relief from the holder of the mortgage and eventually had a foreclosure judgment against her.  This is not a pattern of racketeering activity.

### **RESPA**

Gibson also fails to state a claim under RESPA.  He contends he sent a written request to JP Morgan Chase on behalf of his mother and it did not respond adequately.  Assuming without deciding that the correspondence can be construed as a Qualified Written Request ("QWR"), and to the extent he can get beyond the standing and the statute of limitations issues, he still does not meet the required elements.  RESPA provides for monetary damages only to the extent that the Mortgage lender's alleged failure to adequately respond to the borrower's QWR for information relating to his or her loan caused actual damage to the

Mortgagee.  Gibson does not allege he or his mother sustained actual damages as result of mortgage holder's failure to respond.  12 U.S.C.A. § 2605(e).

### TILA

Gibson fails to state a claim under TILA.  TILA requires the mortgage lender to make certain disclosures about terms and costs at the time the parties enter into the transaction.  12 C.F.R. § 226.1(b).  It also "gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling." *Id*.  The Act and its implementing regulation (Regulation Z, 12 C.F.R. § 226, et seq.) identify events that extinguish the right to rescind.  The right to rescind expires: (1) 3 years after the mortgage is initiated; (2) upon transfer of all of the consumer's interest in the property; or (3) upon sale of the property, whichever comes first.  12 C.F.R. § 226.23(a)(3); *see* 15 U.S.C. § 1635(f).  Again, even if Gibson could get by the standing and *res judicata* bars to relief and the three-year limitation on the right of rescission, the claim expired when the property was sold at sheriff's sale.  He cannot bring that claim now.

### FDCPA

Gibson fails to state a claim under the FDCPA.  The purpose of the Fair Debt Collection Practices Act ("FDCPA") is "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). The term "debt collector" has a particular meaning.  It refers only to persons attempting to collect debts due to "another."  15 U.S.C. § 1692(a)(6) ("The term 'debt collector' means any person who ... regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.").  The statute specifically excludes the creditor from the definition of debt collector.  S*ee Stafford v. Cross*

*Country Bank*, 262 F.Supp.2d 776, 794 (W.D. Ky. 2003) (considering it "well-settled" that "a creditor is not a debt collector for the purposes of the FDCPA and creditors are not subject to the FDCPA when collecting their accounts").  Gibson asserts this claim against the creditor, the former creditor, the law firm that filed the foreclosure action, and the sheriff whose department conducted the sheriff's sale.  JP Morgan Chase and Bayview are the creditors and do not meet the statutory definition of a debt collector.  The Sheriff is not a debt collector.  He executes a court order to conduct a sale of the home.  Furthermore, while LSR could be considered a debt collector, Gibson does not allege facts suggesting they engaged in practices prohibited by the FDCPA.  He suggests only that they filed a foreclosure action.  That is not an unlawful practice under the FDCPA.

### 12 C.F.R. § 1024.41

Although Gibson indicates it is asserted against JP Morgan Chase, and its agents or assignees, including Bayview, count six of the Complaint appears to be directed primarily against JP Morgan Chase with respect to Sylvia Gibson's requests to modify the terms of the loan to prevent foreclosure.  Gibson claims that JP Morgan Chase acted in a dual capacity and breached a fiduciary duty to his mother by leading her to believe they would work with her to modify the terms of her mortgage when they had no actual intention of allowing her to refinance.  He also indicates that if a borrower submits an application for a loan modification 37 days before the sale of the property, the servicer of the loan cannot proceed with the sale while the application is pending.  He states that if the application is submitted 15 days before the sale, the foreclosure cannot proceed.

23

Although Gibson lacks standing to assert this claim and it is barred by *res judicata*, it also fails for other reasons. He does not allege his mother actually submitted a completed loss mitigation application to JP Morgan Chase or that JP Morgan Chase took any specific action, or failed to take any specific action, in violation of the regulations. *See* 12 C.F.R. § 1024.41. In fact, he indicates she was prepared to submit the documents necessary to modify the loan to a lower interest rate. (Doc. 1 at PageID# 50, ℙ 162). He does not allege facts suggesting JP Morgan Chase acted in bad faith.

**42 U.S.C. § 1983**

Gibson indicates this Court has subject matter jurisdiction, in part, under 42 U.S.C. § 1983, although he does not provide any explanation of this claim. To establish a *prima facie* case under 42 U.S.C. § 1983, a plaintiff must assert that a person acting under color of state law deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Generally to be considered to have acted "under color of state law," the person must be a state or local government official or employee. Only Pinkney is a government official. The other Defendants are not subject to suit under § 1983.

Moreover, Gibson indicates his claim arises under the Fourth Amendment but does not provide any explanation of how Pinkney violated this right. Although claims for seizure of property are more often brought under the Fourteenth Amendment for deprivation of property without due process of law, a claim may be stated under the Fourth Amendment. *Soldal v. Cook County, Illinois*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *Thomas v. Cohen*, 304 F.3d 563, 569 -76 (6th Cir. 2002). In order to be actionable under the Fourth

24

Amendment, a seizure must also be objectively unreasonable. *See Soldal*, 506 U.S. at 71, 113 S.Ct. 538 (noting that " 'reasonableness is still the ultimate standard' under the Fourth Amendment").  Gibson does not allege that Pinkney physically seized the property.  He alleges that Pinkney conducted the sheriff's sale as ordered by the court.  While the legal process may have resulted in the transfer of ownership of the property, there is no suggestion that Pinkney himself engaged in any attempt to physically secure the property for the new purchaser.  Moreover, a sale conducted pursuant to a court order is not objectively unreasonable.  *Id.*, 506 U.S. at 71, 113 S.Ct. at 538 (finding that "a showing of unreasonableness where officers act pursuant to a judicial order would be a laborious task indeed.").  Gibson does not allege any facts to suggest that Pinkney violated his Fourth Amendment rights.

**Real Party in Interest and Proper Service of Process**

Pinkney contends he is not the real party interest as he is no longer the current sheriff of Cuyahoga County.  Although he was the sheriff at the time the events in the Complaint took place, he has since retired from that position.  He indicates that the current sheriff should be the named party.

To decide this issue, the Court must determine whether Gibson intended to bring this suit against Pinkney as an individual, or against the Sheriff's Office in general.  Although Gibson states he is bringing this suit against Pinkney in his official capacity, that does not completely resolve this question.  Gibson mentions Pinkney personally, stating, "Pinkney was having a hard time managing the jail system and showed no indication that he was managing the foreclosure and levy departments any smoother."  (Doc. 1 at PageID# 16 at ▯

25

43).  He discusses how Pinkney hired a lawyer, a business owner and a deputy sheriff to be the three appraisers even though they did not all meet the criteria set out by the county for appraisers.  (Doc 1 at PageID# 16, ¶ 44).  These allegations sound specific to Pinkney and not against the office he represents.

Pinkney contends that if he is named as a Defendant in his official capacity, the suit is construed against the office he represents, which he asserts is the sheriff's office.  He argues that the sheriff's office is not *sui juris*, meaning it does not have the legal capacity to sue or be sued.  This reasoning is only partially correct.  A suit against a public official in his official capacity is a suit against the government entity he serves.  *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989).  The government entity that he serves is Cuyahoga County, not the sheriff's office.  Cuyahoga County is *sui juris*.

Nevertheless, regardless of whether Pinkney was named as a Defendant in his individual or official capacity, Gibson failed to properly serve him.  Federal Civil Procedure Rule 4 specifies that a plaintiff may serve an individual within the boundaries of the District Court by: (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or (2) doing any of the following: (A) delivering a copy of the summons and the complaint to the individual personally; (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process. pursuant to the state law for serving process. FED. R. CIV. P. 4(e).  Furthermore, the Federal Rules of Civil Procedure require service to be made by someone who is not a

26

party to the case. FED. R. CIV. P. 4(c)(2).  Gibson himself served Pinkney through certified mail sent to his former business address.  This does not comply with Federal Civil Procedure Rule 4.

That Rule also provides that service can be proper if it is done in accordance with the Ohio Rules of Civil Procedure.  The Ohio Rules allow for service on an individual by certified mail, personal service, or service at the Defendant's residence.  OHIO R. CIV. P. 4.1. These methods of service are done through the Clerk of Court.  Gibson served it himself through certified mail directed to the Defendant's former place of business.  That does not comply with the requirements for service under the Ohio Civil Procedure Rules.

To the extent Gibson is bringing claims against Pinkney in his official capacity, service is also improper.  In that case, Cuyahoga County is the proper Defendant.  Fed. R. Civ. Proc. 4(j) provides for service on a local government by either serving the County's chief executive officer or by serving the Complaint as prescribed by state law.  The Ohio Rules of Civil Procedure allow for service of process on a county by serving the officer responsible for the administration of the office, agency, district, department, institution or unit or by serving the prosecuting attorney of the county.  OHIO CIV. R. 4.2.  Gibson did not comply with the Federal Rule because he did not serve the County chief executive and he attempted to perform service while he is a party to the case.  Gibson did not comply with the state rule because he did not deliver the documents to the current sheriff, the county executive, or the county prosecutor.  OHIO CIV. R. 4.2(l).  Ohio Rules also require service by the Clerk.

Finally, Pinkney contends he is entitled to quasi-judicial immunity.  Gibson's claims against Pinkney pertain to his selection of appraisers and the valuation at which they arrived. While Pinkney or someone under his supervision may select the appraisers, the Court directs the process and approves the sale.  Any objection to the selection of appraisers or their valuation would have to be raised in the foreclosure proceeding.

To the extent Gibson is objecting to Pinkney's actions in conducting the sale or the actions of his deputies in this transaction, he is immune.  An "official is entitled to absolute quasi-judicial immunity when that official acts pursuant to a valid court order because the act of 'enforcing or executing a court order is intrinsically associated with a judicial proceeding.'" *Cooper v.  Parrish*, 203 F.3d 937, 948 (6th Cir. 2000) (quoting *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994)).  Pinkney was performing actions  pursuant to a court order.

**State Law Claims**

Gibson's remaining claims arise, if at all, under state law.  Supplemental jurisdiction exists whenever state law and federal law claims derive from the same nucleus of operative facts and when considerations of judicial economy dictate having a single trial.  *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724 (1966).  The Court, however, may exercise discretion in hearing state law matters.  *Id*. at 726.  In cases where the federal law claims are dismissed before trial, the state law claims should also be dismissed.  *Id*.  Having dismissed Gibson's federal law claims, this Court declines jurisdiction to hear his state law claims.

### CONCLUSION

Accordingly, the Motions to Dismiss (Doc. Nos. 10, 17, 18, 21) are granted, and this action is dismissed without prejudice to Gibson's state law claims.  The Court certifies,

pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.

**IT IS SO ORDERED.**

s/Pamela A. Barker
PAMELA A. BARKER
U. S. DISTRICT JUDGE

Date:  July 8, 2020